## Case No. 1,639.

BOON et al. v. AETNA INS. CO.

[12 Blatchf. 24; 2 Am. Law T. Rep. (N. S.) 179; 9 Am. Law Rev. 150; 4 Ins. Law J. 27.][1]

Circuit Court, D. Connecticut. April Term, 1874.[2]

INSURANCE—THE CONTRACT— BREACH — DESTRUCTION BY MILITARY POWER—DEFINITION—"MILITARY POWER."

1. A policy of insurance, on goods in a store, against loss by fire, contained this proviso, in its body: "Provided, always, and it is hereby declared, that the company shall not be liable to make good any loss or damage by fire, which may happen or take place by means of any invasion, insurrection, riot or civil commotion, or of any military or usurped power, or any loss by theft at or after a fire." The city, in which the store was, was occupied by the United States army, and its city hall contained military stores for the use of such army. The military forces of rebels against the United States government attacked the city and the United States forces. The commander of the latter, in order to prevent such military stores from falling into the possession of the rebels, who were gaining successes in the attack, and ultimately occupied the city, ordered the destruction of such stores. This was done by setting fire to the city hall, and consuming it and its contents. The fire spread through three adjacent buildings to the store containing the insured goods, and they were consumed. After this, the rebels occupied the city: Held, that the proviso did not exempt the insurer from liability for the loss. [See note at end of case.]

2. The loss did not happen by means of the unlawful and rebellious attack on the city, within the meaning of the proviso.
[See note at end of case.]

3. Between the attack and the fire a new power intervened, as a sufficient cause of the fire, rendering the attack, as a cause of the fire, too remote.

4. Whether, even the setting fire to the city hall was not a cause too remote to be the means by which the loss happened, within the meaning of the proviso, quere.
[See note at end of case.]

5. The words "military power," in the proviso, have no reference to the lawful acts of the military forces of the United States, and the proviso does not exempt the insurer from liability for loss caused by the acts of such military forces.
[See note at end of case.]

6. Words of exception in the proviso should be taken most strongly against the insurer.

[At law. Assumpsit [by William C. Boon and others] on a policy of fire insurance brought to the circuit court of the United States for the district of Connecticut, and tried, on an issue closed to the court, before WOODRUFF, Circuit Judge, and SHIPMAN, District Judge, at the April term, 1874.][3]

Francis Fellowes, for plaintiffs.
George W. Parsons, for defendant.

WOODRUFF, Circuit Judge. The facts in this case are not doubtful nor in dispute. The action is brought [by William C. Boon and others] to recover from the defendant the amount of an insurance, against loss by fire, upon the goods of the plaintiffs, in their store in Glasgow, Missouri, in the sum of $6,000. It is founded on a policy executed by the defendant, dated September 2d, 1864, and the goods were destroyed by fire on the 15th of October, 1864, within the term of the insurance. The loss was sufficiently great to entitle the plaintiffs to recover, if the defendant is liable at all, the whole sum insured. The plaintiffs have complied with all the terms and conditions of the policy, by the payment of premium, furnishing proper preliminary proofs of loss, and compliance

---

[1] [Reported by Hon. Samuel Blatchford, District Judge, and here reprinted by permission. 9 Am. Law Rev. 150, contains only a partial report.]

[2] [Reversed in Aetna Ins. Co. v. Boon, 95 U. S. 117.]

[3] [From 4 Ins. Law J. 27.]

with all other requirements. The policy, however, contained the following express proviso, annexed to the agreement of insurance, and in the body of the policy, namely: "Provided, always, and it is hereby declared, that the company shall not be liable to make good any loss or damage by fire, which may happen or take place by means of any invasion, insurrection, riot or civil commotion, or of any military or usurped power, or any loss by theft at or after a fire." The defense herein rests solely on this proviso, and the facts which are claimed to bring the plaintiffs' loss within its operation, so as to exempt the defendant from liability under the policy.

At and before the time of the fire in question, the city of Glasgow, within which the said store of the plaintiffs was situated, was occupied, as a military post, by the military forces, and portion of the army, of the United States, engaged in the civil war then, and for more than three years theretofore, prevailing between the government and the citizens of several southern states, who were in rebellion and seeking to establish an independent government under the name of The Confederate States of America. As such military post, the said city of Glasgow was made the place of deposit of military stores for the use of the army of the United States, which stores were in a building called the city hall of the said city of Glasgow, situated on the same street, on the same side of the street, and about one hundred and fifty feet distant from the plaintiffs' store, three buildings being located in the intervening space, not, however, in actual contact with either. Colonel Chester Harding, an officer of the United States government, and in command of the military forces of the United States, held the possession of the said city, and had lawful charge and control of the military stores aforesaid. On the said 15th of October, 1864, an armed force of the rebels, under military organization, surrounded and attacked the city at an early hour in the morning, and threw shot and shell into the town, penetrating some buildings and killing soldiers and citizens. The city was defended by Colonel Harding and the military forces under his command, and battles between the loyal troops and the rebel forces continued for many hours. The citizens fled to places of security, and no civil government prevailed in the city. The rebel forces were superior in numbers, and, after a battle of several hours, drove the forces of the government from their position, compelled their surrender, and entered and occupied the said city. During the battle, and when the government troops had been driven from their exterior lines of defense, it became apparent to Colonel Harding that the city could not be successfully defended, and he, thereupon, in order to prevent the said military stores from falling into the possession of the rebels, ordered Major

Moore, one of the officers under his command, to destroy them. In obedience to that order to destroy the said stores, and having no other means of doing so, Major Moore set fire to the city hall, and thereby the said building, with its contents, was consumed. Without other interference, agency or instrumentality, the fire spread along the line of the street aforesaid, to the building next adjacent to the city hall, and from building to building, through two other intermediate buildings, to the store of the plaintiffs, and destroyed the same, together with its contents, including the goods insured by the defendant's policy aforesaid. During this time, and until after the fire had consumed such goods, the battle continued, and no surrender had taken place, nor had the forces of the rebels, nor any part thereof, obtained the possession of, or entered, the city.

Upon these facts, and in view of the before mentioned proviso in the policy of insurance, the question arises: Is the defendant liable for the loss of the plaintiffs' goods, or does that proviso exempt the defendant from liability? That question depends upon the answer to be given to some other questions. That is to say:

1. It is insisted, that, within the just and proper meaning of the proviso, the fire in question happened by means of the unlawful and rebellious attack upon the city, by forces acting in assumption of usurped power, endeavoring to capture the forces of the United States, obtain possession of territory in the lawful possession and power of the United States, in aid of the usurped rebel government, and forcibly accomplish its objects and designs; that the fire, and, therefore, the destruction of the goods, were a military necessity, created by such attack by an illegal armed force, and so they happened by means of the rebellion, and the employment of organized forces to effect the objects thereof, and the actual attempt of such forces to overcome the authority and government of the United States; that this was, therefore, the direct or proximate cause of the loss, or, in the words of the proviso in the policy, "the means" by which the fire destroying the goods "happened." We think that this reasoning cannot prevail. Fire destroyed the goods. The fire was not communicated to the goods, nor to the building from which it spread, by the rebel forces, nor by any person acting in co-operation with them; nor was it so communicated, in any wise, in furtherance of the rebellion, its purposes or objects. No act of the rebels, in any physical sense, caused the fire. There is nothing to justify the inference, that the rebels would have destroyed the government stores, found in the city hall, by fire, or otherwise, nor to justify the inference that the destruction of the goods, or any loss thereof, would have happened to the plaintiffs, by the capture and the occupation of the city by the rebels. As

matter of fact, there was no connection, direct or by necessary inference, between such destruction of the goods and the attack of the rebels, the capture of the United States forces, and the occupation of the city.

But, it is said, that such attack by a superior armed force created a military necessity that the government stores should be destroyed, which destruction, in the manner in which alone it could be done, involved the destruction of the plaintiffs' goods, and, so, that destruction was the necessary result of the attack, and that, the fire being thus the necessary result of the attack, it "happened by means" thereof. The fire was actually and voluntarily communicated to the city hall by the military authority of the United States. It is conceded, on this trial, that, in the exigency, it was a lawful exercise of such military authority. The power was discretionary, and, if the circumstances were such as made it discreet—and, no doubt, they were—such setting fire to the city hall may have been a duty. In saying that it was voluntary, we only mean that it was not a physical necessity, nor the physical result of any agency or act of the rebels, or of their unlawful or usurped power. It was physically independent of them, hostile to them, and an act which they not only did not commit, but would not have committed, and would, if possible, have prevented. What is called a military necessity was, therefore, nothing more than this—it constituted the motive, and, no doubt, the sufficient motive, to the burning of the city hall. This was not even an act of resistance to the attack upon the city. It was no part of the defence, nor a force employed in any wise in maintenance of the authority or possession of the government. It was done in an exercise of military discretion, for the incidental purpose of preventing an accession to the means of the rebels for maintaining their rebellion. The importance of preventing such an accession to their means furnished a motive, and, it may be conceded, a controlling motive, to the burning of the city hall, but that did not make the fire happen by means of anything done by them. In a certain sense, it may be true, that the city hall was set on fire by reason of the attack upon the city by an armed force of rebels, but, between that attack and the fire was interposed another actor, who caused the fire, who set in operation the means by which it happened. An efficient and a sufficient cause of fire, and the means by which it happened, intervened between the acts of the rebels and the fire itself, and a cause or means without which, notwithstanding the acts of the rebels, the fire would not have happened at all. In the language of Mr. Justice Miller, in the supreme court of the United States, in Insurance Co. v. Tweed, 7 Wall. [74 U. S.] 52: "If a new force or power has intervened, of itself sufficient to stand as a cause of the misfortune, the other must be considered as too remote." That language was used in reference to a similar provision in a policy of insurance, and in aid of the inquiry by what "means" the fire happened. There, as in this case, there was, in some sense, another cause but for which the fire would not have happened at all; and the opinion shows that the existence of just such an influential cause is not enough to bring a case within the proviso. The facts here are much stronger than the reasoning there, in withdrawal of the case from the operation of the proviso, because, although the fire would not have happened but for the existence of such remote cause—the attack by the rebels—it is equally true that such remote cause would not have produced the fire at all. To apply the criterion suggested by Mr. Justice Miller, there was here the intervention of distinct, new, affirmative power and force, other than the acts of the rebels, not only sufficient but efficient, as the cause of the fire in the city hall, and the actual means by which it happened. We think, therefore, that it cannot be held, that, within the meaning of the proviso in question, the fire which destroyed the plaintiffs' goods happened by means of the rebellion, or of anything done by the rebel forces.

2. An obvious inquiry is suggested by the facts stated—whether the setting on fire of the city hall was the cause of the loss, in such sense that, within the proviso, it was "the means" by which the fire happened, or whether that, also, was not the remote cause of the fire which destroyed the plaintiffs' goods. In our preceding discussion, we have assumed that the setting on fire of the city hall was the means of the fire to the plaintiffs' goods, within that proviso, unless the rebellion or the acts of the rebels should be held to be such means; and that, in this sense, the acts of the lawful military authorities of the United States were the proximate and efficient cause and means by which the fire happened, and of the destruction of those goods by fire. We do not find it necessary to discuss the question, what was the proximate and what was the remote cause of such destruction, under this head. The suggestion, that the setting on fire of the city hall was only the remote cause, while the casual and incidental communication of the fire to the plaintiffs' store, from the burning building next adjacent thereto was the proximate cause of the fire, and the means by which the fire happened, within the meaning of the said proviso, is not made by the counsel for either of the parties. The contrary is conceded, if not, in truth, insisted upon by both. The decision by the supreme court, in Insurance Co. v. Tweed [supra], was assumed by both to be decisive against such a suggestion. We are, therefore, not called upon to pursue that subject.

3. It remains to consider the claim of the defendant that the fire happened by means

which exempt the company from liability, upon the ground that it was caused by "military power," and was, therefore, within the very words of the proviso. It is insisted, by the plaintiffs, that the word "military," in the connection in which it is found in the proviso, does not mean the lawful military power of the government, acting lawfully in the performance of the proper duty of the government forces, whether engaged in hostile contest with an invading army, or in a forcible endeavor to suppress an internal rebellion. For reasons which seem to us convincing, we are of opinion that the word "military," in the proviso in question, has no reference to the lawful acts of the military forces of the government. Neither the reasons for the insertion of the proviso in policies of insurance against fire, nor the history of that insertion, nor any judicial decisions upon the meaning and purport of the proviso, nor the discussions had upon its construction, with especial reference to the meaning of other terms employed therein, sustain the interpretation for which the defendant contends. It is true, that the precise question, what is the import and legal effect of the word "military," does not appear to have been decided in any case to which our attention is called; and, had that proviso been now, for the first time, employed to exempt the defendant from a portion of the liability which the preceding general agreement for insurance imports, there would be much plausibility in the argument, that the defendant intended not only to exclude liability for the consequences of an insurrection, invasion or rebellion, but for the possible consequences of those violent and forcible means which may be necessary to repel or suppress it. And yet, if this was the intent, it may pertinently be asked—why was the exemption limited to the employment of military force, and not made to include the forcible or violent measures which municipal authorities or police organizations might find it necessary to employ to suppress a riot, insurrection or other civil commotion?

The proviso containing the words "military or usurped power" was inserted in policies as early as 1720, and the history of the subject, as given in Ellis on Insurance (page 42, etc.), Park on Insurance (page 445, etc.), and Marshall on Insurance (page 791, etc.), shows that the occasion thereof was manifestly the liability to loss by fire caused by a foreign enemy and invasion. And the terms "military or usurped power" were used in reference to the existence of claims to the exercise of governmental authority enforced within the kingdom, and constituting rebellion against the recognized government. The clause originally embraced no other terms than were apt to indicate the violence of enemies from abroad, and of usurpation exercising governmental authority or rebellion, sustained by organized forces within the kingdom. The exception, as then introduced into policies, read as follows: "No loss or damage by fire happening by any invasion, foreign enemy, or any military or usurped power whatsoever, will be made good by this company." The idea of interference with the peace and safety of the realm by organized force from abroad, or rebellion rising to the proportions of actual or, at least, formal usurpation of governmental authority, whether more or less successful, and manifestly hostile to the lawful government, is indicated by this language. The experience of the country in those days of not infrequent invasion and rebellion, the result of disputes touching the right or the succession to the crown of England, gave occasion for the exception, and, by suggesting its cause, furnished, also, an explanation of its meaning. Foreign invading armies and the organized forces rallied, in whole or in part, within the kingdom, to overturn the government or to enforce the alleged title of a claimant to the crown, usurping or endeavoring forcibly to usurp governmental authority, were in view. Reason for refusing to become liable for losses caused by these forces, in either form, is found not only in helplessness and inability to resist them, and the magnitude of the destruction they may effect, but in the want of recourse for indemnity to those who commit the violence. It is well and pertinently suggested, that while, on the one hand, no one would think of obtaining insurance against the lawful acts of the government, so, on the other, an insurer would not think of excepting such lawful acts as a cause of the fire against which he insured. The citizen without insurance and an insurer making insurance, if that contingency was contemplated, would regard his government as bound and, presumptively, always ready to indemnify against losses sustained by acts done in its own defence or in maintaining the authority of the laws. The subsequent extension of the proviso to "riot, insurrection and civil commotion," rather confirms than impairs this view of the meaning and intent of the original proviso; and these were held to import occasional local or temporary outbreaks, or lawless violence, which, though temporarily destructive in their effects, did not rise to the proportions of organized rebellion against the government. The observations made by the court in the few early cases in which this proviso came under consideration, (although any possible separate meaning of the word "military" is not suggested,) indicate that the clause has reference to acts done in disregard, or in subversion, of lawful authority, and includes only such affirmative acts. Drinkwater v. Assurance Corp., 2 Wils. 363; Langdale v. Mason, referred to by the text writers above cited. In the last named case Lord Mansfield used this significant language (cited in Park, Ins. p. 446): "What is meant by military or usurped power? They are ambiguous; and they seem to have been the sub-

ject of a question and determination. They must mean rebellion, where the fire is made by authority; as, in the year 1745, the rebels came to Derby, and, if they had ordered any part of the town, or a single house, to be set on fire, that would have been by authority of a rebellion. That is the only distinction in the case—it must be by rebellion got to such a head, as to be under authority."

The term "military" is employed, in the proviso, in a meaning synonymous with the usurped power intended to be described, or as qualifying and explaining what was meant by "usurped power." It was in this view, and as a ground of distinguishing between the usurped power specified in the proviso and the power of a mob, that Mr. Justice Bathurst, in the Case of Drinkwater, construed "usurped power" to mean, either an invasion by foreign enemies, to give laws and usurp the government thereof, or an internal force or rebellion, assuming the power of the government, by making laws and punishing for not obeying those laws. An "invasion" necessarily supposed organization and military power or force. So, of the words, "foreign enemy;" and, in the use of a phrase which should include, also, violence within the kingdom, viz., "military or usurped power," something, in like manner, hostile to, or subversive of, the laws and of lawful government, was intended, as plainly as if the clause had been, "or any other military or usurped power." That the terms used in the proviso have express application to force illegally employed and adverse to the government, is indirectly but impliedly involved in the decision and opinion of the court in Insurance Co. v. Corlies, 21 Wend. 367. The court deemed the meaning of the words "usurped power" long settled. The property there in question was destroyed by order of the mayor of the city of New York, for the purpose of arresting a conflagration. It was claimed that this was usurpation of power and authority, in disregard of the law. The court deemed that, if the mayor had no authority to do the act, the company were still liable, for that it was not a usurpation of the power of government, "against which the defendants intended to protect themselves." The case of Spruill v. Insurance Co., 1 Jones (N. C.) 126, tends strongly in the same direction; and, if an armed patrol may be deemed a military power, that case is especially pointed and significant. These considerations and the significant fact that every other word used in this proviso to designate the means by which a fire may happen, for which the company will not be liable, expresses clearly and unequivocally what is unlawful, employed in disregard or in subversion of the laws or the government, furnish a strong case for the application of the maxim relied upon by the plaintiffs—"noscitur a sociis." This maxim is not conclusive, but, in a case of doubt, and where like meaning will satisfy the provision, where there is no other clause or language hostile to the like interpretation, and, especially, where other considerations tend to support it, the maxim has especial force and significance. We think it not too much to say, that most, if not all, intelligent readers of the proviso in question would at once declare that the word military therein was employed in a sense kindred to the other terms, and that it described an organization military in its form but unlawful and hostile to the government in its character and purpose.

Again, it is a familiar rule in the construction of provisoes and exceptions of this sort, made in qualification of the general positive agreement, that words susceptible of either construction should be taken most strongly against the speaker or party whose language is to be interpreted, and that the general and positive agreement should have effect, unless the exception clearly withdraws the case from its operation. This has especial force when the other considerations pertaining to the subject tend to the same result. To this should be added, that it is the duty of an insurance company, seeking to limit the operation of its contract of insurance by special provisoes or exceptions, to make such limitations in clear terms, and not leave the insured in a condition to be misled. The uncertainties arising from provisoes, exceptions, qualifications and special conditions in, or indorsed upon, policies, have been often condemned, and such special modifications are justly characterized as traps to deceive and catch the unwary. An insured may reasonably be held entitled to rely on a construction favorable to himself, where the terms will rationally permit it. Where, as in this case, such construction gives a signification to a word "ejusdem generis" of all those with which it is found associated, and in harmony with the general character and purpose of the provision in which they are found, he is clearly entitled to insist upon such construction.

Our conclusion is, that the plaintiffs are entitled to judgment, for the amount of the insurance, with interest thereon from the expiration of sixty days from the 2d of May, 1865, on which day it is admitted the preliminary proofs of loss were furnished to the defendant, that is to say, with interest from the 1st of July, 1865, and with costs.

[NOTE. Reversed by the supreme court, upon the ground that the risk was within the proviso; Strong, J., after disposing of preliminary questions and reviewing the facts, saying: "It must be concluded that the fire which destroyed the plaintiffs' property took place by means of an invasion or military or usurped power, and that it was excepted from the risk undertaken by the insurers."]